701 A.2d 691

**In re TARIQ A–R–Y.**

**No. 100, Sept. Term, 1996.**

Court of Appeals of Maryland.

Oct. 21, 1997.

Eldridge, J., filed dissenting opinion in which Bell, C.J., joined.

---

Claudia A. Cortese, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Thomas K. Clancy, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* RAKER and WILNER, JJ.

KARWACKI, Judge.

In this case, we granted certiorari to determine whether the parent of an unemancipated minor child can consent to a search of the child's personal belongings left in the common area of the home, over the child's objection. Petitioner, Tariq A-R Y, asserts that searches may not be effected without the consent of the minor owner. The State disagrees, positing that valid consent searches are permissible when the consent is given by one with authority to do so, such as a parent. For reasons that we set out *infra*, we shall hold that a parent of an unemancipated minor can consent to a search of his or her child's personal belongings left in the common area of their home, over the child's objection.

## I.

On May 16, 1995, in response to an anonymous telephone call, Officers Robert Marker and Shawn Stewart of the Frederick County Police Department went to a residence in the Heather Ridge section of the County. A knock on the front door of the home was answered by petitioner; an unidentified woman was observed walking from the house. Both denied having made a telephone call to the police department. At the same time, Tariq's mother drove up to the house. The officers spoke briefly with the unidentified woman, returned to the house, and observed that items there were strewn about and that plants were upset. On the floor was loose tobacco, the butt of a cigar,[1] and an empty, overturned bottle of malt liquor. An odor of marijuana was present in the air and

---

* Karwacki, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of the opinion.

1. Specifically, the officers observed "the butt of a Phillie Blunt that had been cut up." Officer Marker testified that the use of cigar wrappers is a common method of smoking marijuana.

alcohol was detected on Tariq's breath. The officers brought these facts to the attention of Tariq's mother, who, according to the officers, thereafter consented to a search of the house "and anything in it." Starting in the dining room, Officer Marker picked up a vest that was lying on the table. As he did this, Tariq stood and indicated that the vest belonged to him. He was told to sit down and, in the pocket of the vest, a small bag containing what appeared to be marijuana was retrieved. As Tariq was being placed under arrest, he punched and kicked both officers.

At the delinquency hearing held on the State's petition on August 10, 1995, the trial court denied Tariq's motion to suppress the marijuana recovered during the search of his vest. Tariq was later found involved in the possession of marijuana and in resisting arrest; he was found not involved in the possession of paraphernalia. He was thereafter committed to the custody of the Department of Juvenile Services. The Court of Special Appeals in an unreported opinion affirmed the trial court's judgment. Before this Court, Tariq urges that the trial court erred in denying his motion to suppress.

## II.

In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing and do not consider the evidence admitted at trial. *Gamble v. State,* 318 Md. 120, 125, 567 A.2d 95, 98 (1989); *Herod v. State,* 311 Md. 288, 290, 534 A.2d 362, 363 (1987); *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749, 755 (1987). We are further limited to considering only that evidence and the inferences therefrom that are most favorable to the prevailing party on the motion, in this instance the State. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *see also Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22, 22 (1990). In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of witnesses and to weighing and determining first-level facts. *Riddick,* 319 Md.

at 183, 571 A.2d at 1240. When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that those findings were clearly erroneous. *Id.* As to the ultimate conclusion of whether a search was valid, we must make our own independent constitutional appraisal by applying the law to the facts of the case. *Id.*

In ruling on Tariq's motion to suppress the marijuana retrieved from the pocket of his vest, the trial court stated:

"I think that the evidence is admissible under Maryland law. . . . And it would not seem to me that there would be any reasonable expectation of privacy in this vest that was laying in open view on the dining room table. The evidence shows that the owner of the premises gave consent to search the premises and its contents. Therefore, I'm going to deny your motion to suppress for the reasons given."

Notably, the only witness who testified at the suppression hearing was Officer Marker and, as a result, we are limited to a review of that testimony alone in performance of our review. Guided by the principles of limited review set forth above, we defer to the court's assessment of Officer Marker's testimony and demeanor and hold that it did not err in finding as a fact that the consent given by Tariq's mother encompassed the entire house *and* its contents. *See Florida v. Jimeno,* 500 U.S. 248, 251–52, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297, 303 (1991) (scope of consent search defined by expressed object of search unless expressly limited by consenter); *United States v. Ross,* 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572, 591 (1982) (consent "extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search"). We now address whether Tariq's mother was in a position to consent to a search of Tariq's personal effects within the house in the first instance. For that, we look to the Fourth Amendment.

### III.

A principal tenet of the Fourth Amendment is the security of privacy rather than property. *Warden, Md. Peni-*

*tentiary v. Hayden*, 387 U.S. 294, 301, 87 S.Ct. 1642, 1647, 18 L.Ed.2d 782, 788–89 (1967). To this end, its main import is the protection against invasions of the sanctity of one's person, home, and the privacies of life. *Id.* at 301, 87 S.Ct. at 1647, 18 L.Ed.2d at 788–89; *Duncan v. State*, 281 Md. 247, 254, 378 A.2d 1108, 1113 (1977); *see also Gorman v. State*, 161 Md. 700, 704, 158 A. 903, 904 (1932) ("[The] constitutional right of the citizen is the maxim that 'every man's house is his castle'; and in the enjoyment of it he shall not be subjected to unreasonable or illegal searches and seizures."). While the requirement that a warrant based upon probable cause serves to effectuate this goal, only those searches and seizures that are unreasonable are constitutionally prohibited. *Little v. State*, 300 Md. 485, 493, 479 A.2d 903, 907 (1984); *Duncan*, 281 Md. at 254, 378 A.2d at 1113; *Buettner v. State*, 233 Md. 235, 239, 196 A.2d 465, 467 (1964). While searches and seizures conducted without a warrant are considered *per se* unreasonable, *see Ricks v. State*, 322 Md. 183, 188, 586 A.2d 740, 743 (1991); *Riddick*, 319 Md. at 192, 571 A.2d at 1245; *Peterson v. State*, 281 Md. 309, 312, 379 A.2d 164, 166 (1977), *cert. denied*, 435 U.S. 945, 98 S.Ct. 1528, 55 L.Ed.2d 542 (1978); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564, 576 (1971); *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967)), if it can be demonstrated that the search falls within one of a carefully defined set of exceptions, it will be upheld, *Ricks*, 322 Md. at 188, 586 A.2d at 743.

When the sanctity of the home is involved, exceptions to the warrant requirement are few. A permissive search pursuant to voluntary consent is one such limited exception. *United States v. Matlock*, 415 U.S. 164, 165–66, 94 S.Ct. 988, 990, 39 L.Ed.2d 242, 246 (1974); *Schneckloth*, 412 U.S. at 219, 93 S.Ct. at 2043–44, 36 L.Ed.2d at 858 (citing *Zap v. United States*, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); *Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90

L.Ed. 1453 (1946)); *Vale v. Louisiana,* 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409, 413–14 (1970); *McCray v. State,* 236 Md. 9, 14, 202 A.2d 320, 323 (1964). The reason therefor is clear—the individual whose right it is to be free from unreasonable searches and seizures may waive Fourth Amendment protection. This waiver will be effective, however, only as to property in which the individual possesses an actual expectation of privacy, and then only if that expectation is one that society would recognize as reasonable. *Liichow v. State,* 288 Md. 502, 511, 419 A.2d 1041, 1046 (1980); *see also Doering v. State,* 313 Md. 384, 397, 545 A.2d 1281, 1287 (1988) ("In assessing the gravity of an intrusion, we consider the objective expectation of privacy that reasonably existed, and the extent to which it was invaded."); *see also United States v. Ramapuram,* 632 F.2d 1149, 1154 (4th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981) (Ownership alone is insufficient to establish a reasonable and legitimate expectation of privacy for purposes of determining the validity of a warrantless search and seizure; ownership is relevant to the inquiry but the totality of the circumstances determines whether the individual challenging the search has a reasonable and legitimate expectation of privacy in the locus of the search.). In further assessing the validity of the search, one's expectation of privacy is to be measured as of the time of the offending intrusion. *Faulkner v. State,* 317 Md. 441, 447, 564 A.2d 785, 788 (1989). As we have observed, "The concept of a reasonable expectation of privacy in a particular place is not simplistically singular. It involves, instead, a bundle of privacy interests." *Doering,* 313 Md. at 394, 545 A.2d at 1286.

Encompassed within the rubric of permissive searches is the notion of third-party consent, *see Nestor v. State,* 243 Md. 438, 443–45, 221 A.2d 364, 367–68 (1966); *McCray,* 236 Md. at 14, 202 A.2d at 322, the constitutional validity of which has been recognized by the United States Supreme Court, *see Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684, 693 (1969). To this end:

"when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that

consent was given by the defendant but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.[7]

[7] Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman v. United States*, 365 U.S. 610[, 81 S.Ct. 776, 5 L.Ed.2d 828] (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 U.S. 483[, 84 S.Ct. 889, 11 L.Ed.2d 856] (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Matlock*, 415 U.S. at 171, 94 S.Ct. at 993, 39 L.Ed.2d at 249–50; *see also Carter v. State*, 236 Md. 450, 453, 204 A.2d 322, 323 (1964) (A search by permission of person entitled to constitutional protection from unreasonable search is lawful.); *Gross v. State*, 235 Md. 429, 443, 201 A.2d 808, 816 (1964) (same). It was in *Matlock* that the concept of "common authority" as a determinative factor in the validation *vel non* of warrantless searches became firmly entrenched in Supreme Court jurisprudence. Although earlier cases such as *Frazier* and *Coolidge* indicated that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared," *Matlock*, 415 U.S. at 170, 94 S.Ct. at 993, 39 L.Ed.2d at 249, the *Matlock* Court looked specifically to joint access or control in upholding the search authorized by a woman with whom Matlock shared a room, that recovered, *inter alia*, evidence incriminating Matlock in a bank robbery. Thus, it appears that the Supreme Court's theoretical basis for the third-party consent in *Matlock* is: "(i) that the consenting party could permit the search in 'his own right'; and (ii) that the defendant had 'assumed the risk' that a co-occupant might permit a search." 3 W. LA FAVE, SEARCH AND SEIZURE § 8.3(a), at 720 (3d ed.1996).

The waiver of Fourth Amendment rights by a third party most often involves a spouse, cotenant or co-owner, or a parent or guardian. It is the last circumstance with which we concern ourselves in the case *sub judice.* As the State properly observes, searches authorized by a parent or guardian have been justified on three grounds: 1) the parent is the head of the household or owner of the property; 2) the parent is exercising his or her parental authority and control over the unemancipated minor child; and/or 3) the parent is a cotenant or common resident of jointly occupied property. Timothy E. Travers, Annotation, *Admissibility of Evidence Discovered in Search of Defendant's Property or Residence Authorized by Defendant's Adult Relative Other Than Spouse—State Cases,* 4 A.L.R.4th 196, 211–19 (1981). The applicability of each is dependant upon the facts and circumstances of the particular case. We need only address the first and third in order to sustain the search conducted in the instant case. We explain.

Seizing upon the language in *Frazier, Coolidge,* and *Matlock,* Maryland courts have generally held that one who shares with others access to, ownership of, or possessory rights over property necessarily enjoys a diminished expectation of privacy therein. As early as 1964, this Court upheld the trial court's admission of incriminating evidence recovered from a room in which the defendant occasionally slept in his parents' home. *See McCray v. State, supra,* 236 Md. 9, 202 A.2d 320. The facts in *McCray* were as follows: The defendant was observed attempting to break into a store that had been the scene of an earlier burglary; burglary tools were lying in the vicinity of the door. Following McCray's arrest, officers went to his parents' home. Upon answering the door, McCray's father invited them in and gave them verbal permission to search the residence. After the father directed the officers to the sun parlor in which his son slept from time to time, he left to summon McCray's mother to execute written authorization for the search. It was while he was away that officers found an electric hand saw reported taken from the store. The search was thereafter discontinued when McCray's mother refused to sign the form.

■ McCray challenged the admission of the saw into evidence at trial, contending that the search was made with neither a warrant nor permission therefor. Deferring to the trial court's finding that the search was permissive, we opined:

"Both of the investigating officers testified that the father of the defendant, having been informed of the reason for their visit, not only invited them in, but consented to a search and conducted them to the sun parlor. *As an owner and cooccupant of the house, the father was entitled to give such consent and to bind his son in so doing.*"

236 Md. at 14, 202 A.2d at 322 (emphasis added). It is this rationale, as the State points out, that predicates many decisions in this area. The consent of a parent to search his or her residence will act to bind a child such that any evidence recovered as a result will be properly admissible against that child because ordinarily that parent has shared, if not superior, access to or authority over the area and/or items to be searched. See *Waddell v. State,* 65 Md.App. 606, 501 A.2d 865 (1985), *cert. denied,* 305 Md. 622, 505 A.2d 1342 (1986), where the mother's consent to search a room the defendant rented from his parents and to which the mother had unrestricted access was held valid under the theory of common authority; *Tate v. State,* 32 Md.App. 613, 619–20, 363 A.2d 622, 626 (1976), where the mother's consent to search the defendant's bedroom was held to overrule any objection proffered by defendant thereto; the mother "possessed not only a common authority with Tate over the searched premises, but in fact possessed superior authority . . ., including the right to exclude him from the premises"; and *Jones v. State,* 13 Md.App. 309, 315, 283 A.2d 184, 187–88 (1971), *cert. denied,* 264 Md. 749 (1972), where the court rejected the defendant's claim that his mother could not validly authorize a search of his room; she "had the sole control, power and superior right to exclude others, including the appellant, from her home, and also from the very bedroom that the appellant used."

We recognize that the parent-child relationship poses special problems in the context of consent searches under the Fourth Amendment. First, families typically have mutual use

of most household areas and parents usually maintain some degree of control over their child's personal effects and living spaces. *See State v. Carsey,* 295 Or. 32, 664 P.2d 1085 (1983). Second, parents have many responsibilities to their minor child and with those responsibilities come corresponding rights. *See generally,* Maryland Code (1984, 1991 Repl.Vol.), Titles 5 and 12 of the Family Law Article. Among those rights is the right to control and direct the child's conduct in the home. This parental right is sometimes in tension with the minor child's rights under the Fourth Amendment. *See In re Scott K.,* 24 Cal.3d 395, 155 Cal.Rptr. 671, 679, 595 P.2d 105, 112 (1979), *cert. denied sub nom., Fare v. Scott William K.,* 444 U.S. 973, 100 S.Ct. 468, 62 L.Ed.2d 388 (1979) ( Richardson, J., dissenting). Nevertheless, children have Fourth Amendment rights and the parent's authority and control of the child do not singlehandedly define the scope of a child's right to be free of unreasonable searches and seizures. It may well be that the parent's control over the living spaces and personal effects of a minor child will validate the parent's consent to search in the vast majority of cases. There may also be cases, however, in which a parent's consent to search would not be valid in the face of the child's objection. We leave that determination for another day.

## IV.

■ Tariq contends that case law augurs in favor of suppression of the evidence because his mother was not in fact in a position to consent to a search of his personal belongings. Specifically, he asserts that

> "(1) [his] mother lacked the requisite actual and apparent common authority over [his] vest to give consent to its search; (2)[he] had a reasonable expectation of privacy in [the] vest which he did not waive; and (3)[his] mother could not override his constitutional right to be free of unreasonable searches and seizures."

The short answer to this contention is that petitioner left his vest in the common area within the family home, i.e., the

dining room. The State established that (1) Petitioner was residing in his mother's home; (2) Petitioner was paying no rent; (3) Petitioner was a minor; (4) Petitioner's mother manifested her authority over the premises by inviting the officer into the house and telling him that he was free to search the entire house; and (5) the vest the officer searched was located in the dining room. Applying *Matlock* to this case, when Petitioner left his vest in the dining room, a room to which other family members had equal access, he assumed the risk that his mother, who had authority in her own right to consent to a search of the vest left in a common area of the house, would herself look into his vest pockets, or expose his vest to a search by others. *See generally* 1 W. LAFAVE & J. ISRAEL, CRIMINAL PROCEDURE, § 3.10(d), at 350.

In light of the above discussion, we comment upon Tariq's assertion that his "objection" rendered the officer's search unlawful only to say that any objection lodged in the face of a parent's lawful consent under these circumstances is unavailing. We, therefore, hold that the trial court properly denied Tariq's motion to suppress the marijuana recovered during the search of his mother's home.

### JUDGMENT AFFIRMED, WITH COSTS.

Dissenting opinion by ELDRIDGE, J., in which BELL, C.J., joins.

ELDRIDGE, Judge, dissenting.

I dissent. Under the totality of the circumstances presented, the search of Tariq's vest was unreasonable and violated the Fourth Amendment.

Prior to the search the police officers received consent from Tariq's mother to search the house and "anything in it." Thus, it may have been reasonable at the outset for the officers to believe they had permission to conduct a broad general search of areas such as the dining room. Subsequently, however, Tariq's objection to the search of his vest should have raised an ambiguity in the minds of the police officers. At the moment Tariq asserted his interest and expectation of

privacy in the vest, the officers should have turned to his mother, who was present at the scene, and specifically clarified that the original general consent to search also included the search of the item of Tariq's clothing located in the dining room.

It is clear that an individual may waive the warrant requirement of the Fourth Amendment through knowing and voluntary consent. The standard for measuring the scope of a person's consent under the Fourth Amendment is that of objective reasonableness, that is, what would an ordinary reasonable person understand to be the scope of consent between the officer and the consenting person. *Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *Wilkerson v. State*, 88 Md.App. 173, 594 A.2d 597 (1991). In conducting the reasonableness inquiry, the court must consider what the parties knew to be the object of the search at the time. *Jimeno, supra*, 500 U.S. at 251, 111 S.Ct. at 1803–1804, 114 L.Ed.2d at 302–303. Thus, the scope of a search is generally defined by its expressed object. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *see also Gamble v. State*, 318 Md. 120, 129, 567 A.2d 95, 100 (1989) ("Of course, '[a] consensual search may go no farther than the limits' defined by the consent," quoting *State v. Jensen*, 44 Wash.App. 485, 723 P.2d 443, 446 (1986)).

While the majority concedes that "children have Fourth Amendment rights and the parent's authority and control of the child do not singlehandedly define the scope of a child's right to be free of unreasonable searches and seizures" (Opinion at 495, 701 A.2d at 696), it ends its inquiry with a finding that the mother had the *authority* to consent to the search. The majority fails to examine whether the scope of the search was reasonable and states that "any objection lodged in the face of a parent's lawful consent under these circumstances is unavailing" (*id.* at 496, 701 A.2d at 697). In so holding, the majority ignores its own statement that, "[i]n further assessing the validity of the search, one's expectation of privacy is to be measured *as of the time of the offending intrusion*" (*id.* at 491, 701 A.2d at 694 emphasis added). The validity and

reasonableness of the search, therefore, are determined at the moment Tariq expressed an expectation of privacy in his vest. Tariq's protest gave rise to an ambiguous situation which the officers were in an excellent position to resolve with little or no burden. They needed simply to turn to Tariq's mother and confirm that they did, indeed, have permission to proceed with the search of the vest.

In holding that there was a valid consensual search of Tariq's vest, the majority particularly relies on *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971);[1] *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), and their progeny. The facts in the case at bar, however, are fundamentally different from the facts in the above-cited cases. In each of those cases, there was no question or ambiguity concerning the scope or object of the consented search.

In *Matlock, supra,* 415 U.S. at 166, 94 S.Ct. at 991, 39 L.Ed.2d at 247, the officers conducting the warrantless search identified that "they were looking for money and a gun" prior to asking permission to search. When consent for the search was given, the object and scope were known and adhered to. Similarly, in *Frazier, supra,* 394 U.S. at 740, 89 S.Ct. at 1425, 22 L.Ed.2d at 693, the police requested permission to search a duffel bag that belonged to the defendant but was in his cousin's house and was being used by his cousin. The police received permission to search the bag from both the cousin and the cousin's mother. Again, the scope of the warrantless

---

1. It is interesting that the majority relies on *Coolidge, supra,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. In *Coolidge,* the Court held that the officers did not go to the defendant's home to conduct a search. Rather, they merely asked if the defendant owned any guns and the guns were *offered* to the officers. The officers then asked for and were given the clothes of the defendant. The Court held that under these facts a search did not take place. *Coolidge, supra,* 403 U.S. at 489, 91 S.Ct. at 2050, 29 L.Ed.2d at 596. Assuming, *arguendo,* that *Coolidge* is a consent to search case, the items sought were clearly identified, the scope of any "search" was known by the third party at the time of the consent, and there was no ambiguity concerning the consent.

search was established prior to its execution and carried out in accordance with the permission given. In both instances the police officers and the consenter were clear concerning the permission given. The scope of the consented search was identified to the third party and the permission given was specific to the asserted scope.

The majority also relies on dicta from *McCray v. State*, 236 Md. 9, 202 A.2d 320 (1964), for the proposition that an owner and co-tenant of a home has the authority to consent to a search. Although *McCray* is not an authority to consent case, it presents a set of facts illustrative of reasonable behavior that is lacking in the instant case. In *McCray, supra*, 236 Md. at 14, 202 A.2d at 322, the police officers executing the warrantless search "informed [the defendant's father] of the reason for their visit" and asked permission to search the premises. Thereafter the father escorted the officers to the room his son occupied on the few occasions when he spent the night. The father refused to sign a consent to search form, but he left the officers alone in the room, saying his wife would sign it. At that moment the police officers reasonably believed that they had permission to search the room: the father invited them into the home, knew they were investigating a robbery, left them to their own devices in the room where his son slept, and went to get his wife so that she could sign the consent form. Under the totality of the circumstances it was reasonable for the officers to believe they had permission to conduct a search.

Likewise, it may have been reasonable for the police officers in the present case to believe, at the outset of the search, that they had permission to conduct a broad search of rooms used by all family members. At the instant Tariq objected, however, a warning light should have gone off in the minds of the officers. In *McCray,* the wife refused to sign the consent to search form and the search was immediately discontinued. The officers faced with Tariq's protest should have confirmed that they had his mother's permission to continue.

Another case relied on by the majority which illustrates reasonable behavior is *Tate & Hall v. State,* 32 Md.App. 613, 363 A.2d 622, *cert. denied,* 278 Md. 736 (1976). In *Tate,* the officers first received permission to search the home for the defendant. Failing to find him, the officers then asked for and received permission to "conduct a search of the house for evidence." *Tate & Hall, supra,* 32 Md.App. at 618, 363 A.2d at 626. Thus, the officers recognized that the initial consent limited the scope of their search, and it was appropriate for them to seek permission to broaden their search.

*Jones v. State,* 13 Md.App. 309, 310–311, 283 A.2d 184, 185 (1971), *cert denied,* 264 Md. 749 (1972), is the sole case relied on by the majority which involved consent to a general undefined search. As here, the mother in *Jones* gave broad general permission to the police to search the house, and both she and her son were present during the search. *Jones,* however, is easily distinguished. In *Jones,* the mother went to the police station and requested that her son be arrested on drug charges. An arrest warrant was obtained for the defendant, and the police officers accompanied the mother back to her home. Her son was arrested, and she consented to the police officer's request to search the property. She knew that drugs were present in the home when she gave her permission to search. The defendant was present during the search, and at no time did he object to the search or assert a privacy interest in the personal items being searched. Thus, there was no ambiguity, and under the totality of the circumstances the police officers' behavior was reasonable.

Conversely, under the totality of the circumstances presented in this case, the officers' conduct was not reasonable. Here, Tariq and his mother were present at the search. The original consent given was extremely general in nature and was not in response to a request to search for specific items. Subsequently, Tariq asserted an interest in the vest. At that moment the question arose: Did the consent given include items in which Tariq expressed a privacy interest? Faced with such an ambiguous situation, the officers should have made further inquiries. "It is the government's burden to

establish that a third party had authority to consent to a search ... [and that] burden cannot be met if the agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." *United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C.Cir.1991). The additional burden of asking Tariq's mother for permission to search the vest was slight. Thus, I would hold that the search was unreasonable and that the evidence should have been suppressed.[2]

BELL, C.J., agrees with the views expressed herein and joins this opinion.

---

**2.** If the officers had asked Tariq's mother for permission to search the vest, and if she had specifically granted the permission despite Tariq's objection, I would agree with the majority that Tariq's mother could "consent to a search of [her minor] child's personal belongings left in the common area of their home, over the child's objection." (Opinion at 487, 701 A.2d at 692). It is important to emphasize that the majority's holding is limited to the circumstances here, involving a child's vest left in a common area of the home. Whether, to what extent, and under what circumstances, a parent may be authorized to consent to a search of a child's person, or of a container belonging to the child, or of a room used exclusively or primarily by the child, are questions not presented by this case and not decided by the majority. (*See* Opinion at 494–496, 701 A.2d at 696–697). While I also express no views on such questions at this time, it should be noted that children do have constitutional rights independent of their parents and that, under some circumstances, parents cannot waive their children's rights. *See generally, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 333–337, 105 S.Ct. 733, 738–740, 83 L.Ed.2d 720, 729–732 (1985) (Fourth Amendment applies to search of a 14–year–old student's purse by school officials who arguably stood *in loco parentis* at the time); *Planned Parenthood v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788, 808 (1976) ("Minors, as well as adults, are protected by the Constitution and possess constitutional rights"), and cases there cited; *Brown v. Fauntleroy*, 442 F.2d 838 (D.C.Cir.1971); *In re Scott K.*, 24 Cal.3d 395, 155 Cal.Rptr. 671, 595 P.2d 105, *cert. denied*, 444 U.S. 973, 100 S.Ct. 468, 62 L.Ed.2d 388 (1979) (police officers were not authorized to search a tool box belonging to a minor based on his father's consent); *State v. Carsey*, 295 Or. 32, 664 P.2d 1085 (1983).