**Myers v. State, No. 2933 of the 2018 Term, Opinion by Moylan J.**

SECOND-DEGREE BURGLARY – TWO SECURITY CAMERAS ARE BETTER THAN ONE – THE CONTENTIONS – A CASE OF BAYING AT THE MOON – IDENTIFYING THE RIGHT CHURCH – SUPPRESSION HEARING LAW 101 – STANDARD OF APPELLATE REVIEW – WAS THERE A DISCOVERY VIOLATION? – SANCTIONS AND WINDFALLS – A PROCEDURAL CAVEAT – THE PERMISSIBILITY OF A LINE OF QUESTIONING – A NON-BLOCKBUSTER ERROR IN ANY EVENT

Circuit Court for Baltimore City
Case No. 118057003

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2933

September Term, 2018

_____

MURRAY MYERS

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Berger,
Moylan, Charles E., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: November 6, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The appellant, Murray Myers, was convicted in the Circuit Court for Baltimore City by a jury, presided over by Judge Althea M. Handy, of burglary in the second degree, conspiracy to commit second-degree burglary, and theft of more than $100 but less than $1,500.

## Two Security Cameras Are Better Than One

The evidence of the appellant's complicity was straightforward. At approximately 3:44 a.m. on December 12, 2017, a burglary was committed at an animal clinic operated by the Society for the Prevention of Cruelty to Animals at 4007 Falls Road in Baltimore City. Not one, but two security surveillance cameras memorialized the crime. One of the cameras was located on the SPCA Clinic property itself. The second was located on the Red Fish Liquor Store, on the same side of the street as the burglarized premises but one building away.

The security camera on the SPCA Clinic building did a yeomanlike job of recording the corpus delicti but utterly failed to establish anyone's criminal agency. Initially it showed two individuals walking south on Falls Road toward the SPCA Clinic. As one of them, referred to as "Individual One," closed in on the target, the other, referred to by the State simply as the "lookout," was observed walking back and forth generally in front of the clinic. At 3:44 a.m., Individual One entered the building through a side window. A hoody, however, obscured his face. As the burglar alarm sounded, Individual One exited the clinic. Almost immediately, however, he returned to the side window, grabbed a cash register that was sitting on a desk, and fled the scene with the cash register in hand. The

cash register was later determined to have been empty, but its own value was established to have been $500.

Because of the hoody covering his face, the identity of Individual One could not be established either by the SPCA Clinic manager, Amy Stormann, or by Detective William Nickles, both of whom viewed the security tape from the clinic's camera. The identity of the other individual, the "lookout," was never established. The crime might well have become an unsolved cold case, but for a stroke of good fortune. Although the security camera on the burglarized premises itself had come up short, a Good Samaritan security camera on the neighboring Red Fish Liquor Store stepped in to save the day. It was a day later as part of his follow-up investigation that Detective Nickles visited Red Fish to see if it had any surveillance footage from the night of the burglary. It had. From its more fortuitous coign of vantage, moreover, the burglar's face was visible, unhidden by the hoody. Detective Nickles, who had known the appellant for years, immediately identified Individual One as the appellant. Detective Nickles actually knew the appellant by name and was thereby able to obtain his address from the Department of Motor Vehicles. The appellant was shortly thereafter arrested and indicted.

At trial, the clinic manager testified briefly. The only other State's witness, and its key witness, was Detective Nickles. He testified that he was "[o]ne hundred percent positive that that is Mr. Murray Myers [(the appellant)] in that video." He explained to the jury that he possessed that level of certainty because "I've known of Mr. Murray Myers for many years being associated from the same neighborhood." Detective Nickles further explained that he and the appellant had numerous mutual friends.

2

> My ex-sister-in-law, which is [the appellant's] cousin, by the name of Brenda Brown. Numerous friends from the neighborhood. We have multiple mutual Facebook friends. From being from the neighborhood, I mean, it's only obvious that we would have these mutual friends. I guess, numerous.

(Emphasis supplied). Detective Nickles also identified the appellant in court:

> Q. Okay. The person you see in the video with the cash register, do you see that person in court here today?
>
> A. I do, yes.
>
> Q. Can you please identify him by an article of clothing?
>
> A. Sitting at the Defense table with a black shirt and a green and black tie with a cane in his hand.
>
> Q. How certain are you that that is that person?
>
> A. I'm a hundred percent certain.

(Emphasis supplied). The appellant, moreover, was established as living at 3735 Falls Road, just under three blocks away from the burglarized premises.

In his cross-examination of Detective Nickles, the defense never really challenged the detective's ability to recognize the appellant as someone he had known for a number of years. The appellant neither took the stand nor offered any witnesses or other evidence in his defense. The jury convicted him on all counts.

### The Contentions

On appeal, the appellant raises three contentions.

1. THE TRIAL COURT ERRED WHEN IT DENIED [THE APPELLANT'S] MOTION TO SUPPRESS DETECTIVE NICKLES'[S] PRE-TRIAL IDENTIFICATION.

2. THE TRIAL COURT VIOLATED [THE APPELLANT'S] SIXTH AMENDMENT RIGHT AND ARTICLE 21 OF THE MARYLAND

3

DECLARATION OF RIGHTS WHEN IT DENIED DEFENSE COUNSEL'S ABILITY TO PRESENT A FULL DEFENSE DURING CROSS-EXAMINATION OF THE STATE'S KEY WITNESS.

3. THE STATE COMMITTED PLAIN ERROR IN ITS CLOSING WHEN IT BOLSTERED DETECTIVE NICKLES'[S] TESTIMONY WITH FACTS NOT IN THE RECORD.

## A Case Of Baying At The Moon

In military jargon, one would not characterize the appellant's contentions as arguments that turn square corners. He beguiles us with facts, but he never tells us where he is going with those facts.

The most serious contention is that Judge Handy committed reversible error when she denied the appellant's motion to suppress a pre-trial identification of him by Detective Nickles. A hearing was held on that motion on Tuesday, September 18, 2018. The entire suppression hearing that day consumed a scant 24 pages of transcript. The oddity is that that brief hearing disposed of, sequentially, not one but two suppression motions. The first of the two denials is not now before us. It nonetheless behooves us to refer to it because it is indicative of the general slackness of the appellant's analysis of the legal issues in the case, indicative of his disinclination to turn square corners.

For all that we are told in appellate briefs or in the testimony at the suppression hearing or testimony at the trial, there was not so much as a hint that the search warrant the appellant tells us the police were applying for was ever actually issued by a judge. Even assuming that it was, there is not a suggestion that a search, warranted or unwarranted, was ever executed. There was no fruit of a search and seizure ever offered in evidence. It was certainly not the case that the stolen cash register was recovered from the appellant's

4

apartment or some reference would certainly have been made of so prominent a piece of evidence. What, therefore, was this companion suppression motion all about and why was it in the case?

Inexplicably, after a mere seven pages of essentially meaningless conversation between court and counsel with respect to it, the motion to suppress physical evidence because of an ostensible Fourth Amendment violation just withered on the vine. The appellant never suggested how a Fourth Amendment violation had even occurred. Judge Handy, with some exasperation, explained that if the motion were based on the fact that an application for a warrant did not establish probable cause, the motion to suppress evidence on such a basis was denied. As attention immediately turned to the separate and pertinent issue of pre-trial identification, there was no allegation that a warrant application had ever actually been submitted to a judge, let alone that any judge had actually issued such a warrant, and let alone that a warranted search had ever been executed. The Fourth Amendment issue simply evanesced, as immediately and as completely as if it had been a magician's puff of magic smoke.

We are left with the quandary of why the appellant would clutter the record with a motion to suppress physical evidence when there was no physical evidence to be suppressed. What, moreover, does the appellant suggest the sanction should be for a possibly contemplated Fourth Amendment violation that never took place? To the question, "What difference does it make?" the possible answer may be that, if nothing else, it sets the tone for much of the argument that follows. If an argument is raised, we would like to know where it is going.

**Identifying The Right Church**

There is yet another aspect to the strategic value, to the persuasive cogency, of turning square corners. It is always prudent not to get too deeply involved in the detailed minutiae of any issue before identifying the larger category to which the issue itself belongs. Don't worry about which pew you are in until you are sure that you are in the right church. Don't worry about winning the battle until you are sure you are in the right war. A fact is not a self-contained entity. In forensic argument, the fact is used to point to a legal conclusion. An advocate should not simply give us a fact. He should identify the precise legal conclusion toward which he is pointing that fact.

The appellant's first actual contention, ultimately unencumbered by any irrelevant Fourth Amendment spin-off, is that Judge Handy erroneously denied his motion to suppress Detective Nickles's pretrial identification of him. At first blush, that sounds like a problem involving identification law. The enveloping category on this appeal, however, is not identification law. It is discovery law. Identification law, after all, is obsessed with the issue of the ultimate reliability of the identification. The dramatic change of direction of <u>Simmons v. United States</u>, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247, in 1968 from impermissible suggestiveness to ultimate reliability and the five-factored reliability tests of <u>Neil v. Biggers</u>, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), are all consumed by reliability as the ultimate dispositive criterion. They have nothing to do, however, with the challenged identification in this case. The appellant's facts in this case are not pointed in that direction.

6

Even after the distinction made by this Court in <u>State v. Greene</u>, 240 Md. App. 119, 130–34, 201 A.3d 43, <u>cert. granted</u>, 463 Md. 525, 206 A.3d 315 (2019), following the lead of <u>People v. Rodriguez</u>, 79 N.Y.2d 445, 583 N.Y.S.2d 814, 593 N.E.2d 268 (1992), and recognizing the analytic distinction between selective identification issues and confirmatory identification issues, the controlling criterion remained the reliability of the confirmatory identification.

In discovery law, by dramatic contrast, an appropriate sanction for a discovery violation might well be the suppression of an identification, notwithstanding its impeccable reliability. The purpose of the exclusionary sanction is to punish the discovery violation, not to ensure reliability. Identification law and discovery law serve very different, and sometimes contradictory, masters. The same facts may point in a very different direction. Albeit dealing, to be sure, with the possible suppression of an identification, our overarching legal consideration (our "church," our "war") in this case is discovery law, not identification law. That is our controlling body of law in this case. The appellant's argument, however, never makes its larger legal context, the direction of its forensic attack, unmistakably clear. He wanders back and forth across a doctrinal boundary line. This random lack of direction is the very opposite of turning square corners.

## Suppression Hearing Law 101

As we narrow our focus to the hearing on the motion to suppress the identification of the appellant by Detective Nickles, no precept of appellate review is more fundamental than that articulated by the Court of Appeals in <u>In re Tariq A–R–Y</u>, 347 Md. 484, 488, 701 A.2d 691 (1997):

7

> In reviewing the denial of a motion to suppress, <u>we look only to the record of the suppression hearing and do not consider the evidence admitted at trial.</u> <u>Gamble v. State</u>, 318 Md. 120, 125, 567 A.2d 95, 98 (1989); <u>Herod v. State</u>, 311 Md. 288, 290, 534 A.2d 362, 363 (1987); <u>Trusty v. State</u>, 308 Md. 658, 670, 521 A.2d 749, 755 (1987).

(Emphasis supplied).

In <u>Coley v. State</u>, 215 Md. App. 570, 582, 81 A.3d 650 (2013), Judge Rodowsky

wrote for this Court to the same effect.

> As we have explained, "[i]n reviewing the denial of a motion to suppress, <u>we look only to the record of the suppression hearing and do not consider the evidence admitted at trial.</u>" <u>See, e.g., In re Tariq A–R–Y</u>, 347 Md. 484, 488, 701 A.2d 691, 693 (1997), <u>cert. denied</u>, 522 U.S. 1140, 118 S. Ct. 1105, 140 L. Ed. 2d 158 (1998). <u>See also Stokeling v. State</u>, 189 Md. App. 653, 661, 985 A.2d 175, 180 (2009), <u>cert. denied</u>, 414 Md. 332, 995 A.2d 297 (2010) ("<u>In reviewing the denial of a motion to suppress evidence, we look exclusively to the record of the suppression hearing.</u>").

(Emphasis supplied).

In <u>Wallace v. State</u>, 219 Md. App. 234, 243, 100 A.3d 1173 (2014), Judge Nazarian

wrote for this Court, in re-affirming that fundamental tenet of appellate review.

> In reviewing the circuit court's disposition of Mr. Wallace's motion to suppress, "'<u>we look only to the record of the suppression hearing and do not consider the evidence admitted at trial.</u>'" <u>James v. State</u>, 191 Md. App. 233, 251, 991 A.2d 122 (2010) (quoting <u>Massey v. State</u>, 173 Md. App. 94, 100, 917 A.2d 1175 (2007)).

(Emphasis supplied).

This is Suppression Hearing Procedure 101. In reviewing the appellant's argument

on this contention, however, we are immediately confronted with a massive and flagrant

violation of that fundamental precept as to what not to consider. The appellant does not

sneak across the line separating the trial from the suppression hearing. He crosses it with a

tractor trailer. The appellant's argument on suppression runs for five pages in his brief. Three of those five pages, however, are a self-contained subdivision of his larger argument entitled, "B. Detective Nickles'[s] Trial Testimony Confirms the State's Violation of Rule 4–263." (Emphasis supplied). The appellant does not simply commit a procedural transgression. He holds up a sign, with his subhead, pointing out exactly where the transgression is going to be. That subdivision of the appellant's argument then details at significant length the trial testimony of Detective Nickles. Precisely such a violation was before this Court in Coley v. State, supra. Our unequivocal holding was that such post-suppression hearing evidence could not and would not be considered in reviewing the suppression hearing.

> Any record that developed in the circuit court after a binding suppression ruling was made is simply immaterial to our review. The suppression judge was not able to consider a possible inconsistency that would not exist until three weeks after he ruled on the motion and that would not be raised by either party until the State filed its appellate brief. We shall not consider it now.

215 Md. App. at 582–83 (emphasis supplied). See also In re Tariq A–R–Y, 347 Md. at 489 ("Notably, the only witness who testified at the suppression hearing was Officer Marker and, as a result, we are limited to a review of that testimony alone in performance of our review." (Emphasis supplied).).

Accordingly, we do not consider any of Detective Nickles's trial testimony as having any bearing on the correctness of Judge Handy's ruling at the suppression hearing not to suppress the identification of the appellant by Detective Nickles. Judge Handy's decision on Tuesday cannot have been wrong on the basis of evidence that did not exist

until Wednesday. She clearly cannot be held to have been in error for not having been prescient. The appellant's reasoning strays outside the clearly demarcated box. He does not turn square corners.

## Standard Of Appellate Review

Although three of the appellant's five pages of argument on the suppression issue cannot (and will not) be considered by us because they are grounded in evidence from the trial proper rather than in evidence from the suppression hearing, the two remaining pages of argument at least are properly before us. As we consider them, it is appropriate to set out the standard guiding our review.

As the proponent of the motion to suppress Detective Nickles's confirmatory identification of the appellant, it was the appellant, of course, who bore the initial burdens of both production and persuasion. Epps v. State, 193 Md. App. 687, 701–02, 1 A.3d 488 (2010). It was the appellant's obligation to persuade Judge Handy that the identification should have been suppressed. It was not the State's obligation to persuade Judge Handy that the identification should not have been suppressed. If Judge Handy had not been persuaded in either direction, of course, the identification would have remained unsuppressed. It is the party to whom is allocated the burden of proof who loses the tie. As this Court explained the significance of the allocation of the burden in Herbert v. State, 136 Md. App. 458, 484, 766 A.2d 190 (2001):

> It is the defendant who must make a case for the suppression of evidence. The State is not required to make a case for the non-suppression of evidence. If a judge should convene a suppression hearing and if both parties should rest without saying a word, the State would win that nothing-to-nothing tie. More precisely stated, the defendant would lose the nothing-to-nothing tie.

10

(Emphasis supplied; citation omitted). See also Duncan and Smith v. State, 27 Md. App. 302, 317, 340 A.2d 722 (1975), vacated on other grounds, 276 Md. 715, 351 A.2d 114 (1976).

In Herbert v. State, 136 Md. App. at 482, this Court fully explained the rationale justifying such a decided tilt against the moving party.

> In a criminal trial, the status quo—the norm—is that evidence of a defendant's guilt that is relevant, material, and competent will be admitted. It is the defendant who seeks to alter that status quo—who seeks a departure from that norm-when he seeks to exclude relevant, material, and competent evidence of guilt in order to serve some extrinsic purpose, such as deterring the police from future unreasonable searches and seizures. Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). To the moving party is allocated the burden of making the case for such an alteration of the status quo-for such a departure from the norm.

(Emphasis supplied). By that standard, how did the appellant fare?

### Was There A Discovery Violation?

We will operate on the assumption that this contention is based on discovery law. Maryland Rule 4–263 sets out the pre-trial discovery rules for criminal trials in Maryland. Rule 4–263(d)(7)(B) specifically provides:

> **(d) Disclosure by the State's Attorney.** Without the necessity of a request, the State's Attorney shall provide to the defense:
>
> . . . .
>
> (7) Searches, Seizures, Surveillance, and Pretrial Identification. All relevant material or information regarding:
>
> . . . .
>
> (B) pretrial identification of the defendant by a State's witness[.]

(Emphasis supplied).

11

At the suppression hearing, the only evidence bearing on the pre-trial identification came from Detective Nickles himself. He was the lead investigator on the case. When he viewed the initial security tape from the building of the SPCA Clinic itself, he could not identify the person on the tape because the face was hidden by a hoody. When he viewed the second security tape, by contrast, that made by the camera on the neighboring Red Fish Liquor Store, the face of the burglar was visible and Detective Nickles identified the burglar as the appellant, Murray Myers. This was the pre-trial identification now in issue. As per the distinction this Court pointed out in State v. Greene, 240 Md. App. 119, 201 A.3d 43 (2019), this was a confirmatory identification rather than a selective identification. On the basis of his prior acquaintanceship with the appellant, Detective Nickles was simply confirming that the person pictured on the tape was the appellant.

The testimony with respect to the State's compliance with its discovery obligations, however, is exasperatingly vague. This poses no ultimate problem, however, because no point has been made with respect to it. An obvious problem, albeit not a fatal one, was that the State, pursuant to its discovery obligation, communicated information to defense counsel by oral communication rather than in writing. This did, however, cause Judge Handy to complain, a complaint in which we join.

> THE COURT: All right, Counsel, I wish you would learn to put any discovery, any additional discovery in writing and file it with the Court. Don't rely on oral conversations.

> [THE STATE]: Will do, Your Honor.

(Emphasis supplied).

12

Further muddying the waters was the fact that the oral communication about discovery had been made in July, two months before trial, to defense counsel who subsequently withdrew from the case. To what extent earlier defense counsel communicated his knowledge to later defense counsel was not so much as alluded to in the record. Again, however, this poses no problem because none of this has remotely been presented as an issue before us.

The thrust of the appellant's contention, rather, is that the State violated its discovery obligation when it furnished **<u>false</u>** and **<u>inadequate</u>** information to the defense as to the basis on which Detective Nickles had been able to confirm that the burglar depicted on the security tape from the Red Fish Liquor Store was, indeed, the appellant.

With respect to the claim that the State had furnished **<u>false</u>** information, that charge was quickly disposed of. The heart of Detective Nickles's claim that he knew the appellant by sight was that the two of them had grown up in the same neighborhood and that the detective had been acquainted with the appellant for the better part of 40 years.

Somehow, in the course of pre-trial discussion between the detective and the Assistant State's Attorney prosecuting the case, however, the prosecutor came to the erroneous assumption that the detective and the appellant had gone to high school together. That erroneous assumption was somehow communicated to defense counsel. It was only at a scheduling conference before Judge Melissa M. Phinn on the day before the suppression hearing and involving the prosecutor and an Assistant Public Defender sitting in for defense counsel that it became clear that such a mistaken notion was afoot. The State disclaimed any intention of relying on such a claim. On direct examination at the

13

suppression hearing, Detective Nickles made it clear that he and the appellant had not attended high school together. Judge Handy's questioning of the State was brief.

> THE COURT: <u>Did Detective Nickles tell you he didn't go to high school</u> --
>
> [THE STATE]: And <u>then yesterday he told me that he did not go to high school with him, and I let the defense counsel know that he did not go to high school with him.</u>
>
> THE COURT: <u>All right, so he did not go to high school with him, he knows him from the neighborhood.</u>

(Emphasis supplied).

That ended the matter and we see therein no abuse of discretion. As Judge Battaglia pointed out for the Court of Appeals in <u>Williams v. State</u>, 364 Md. 160, 172, 771 A.2d 1082 (2001):

> Inherent benefits of discovery include providing adequate information to both parties to facilitate informed pleas, ensuring thorough and effective cross-examination, and expediting the trial process by diminishing the need for continuances to deal with unfamiliar information presented at trial. Specific to the mandatory disclosure provisions of Rule 4–263(a), <u>the major objectives are to assist defendants in preparing their defense and to protect them from unfair surprise.</u>

(Emphasis supplied).

The appellant was obviously not taken by "unfair surprise." It was he who first informed defense counsel that the erroneous assumption could not be true because he had never gone to high school at all, with the detective or with anyone else. From this trivial misstep or minor misunderstanding, the defense suffered no conceivable prejudice.

The appellant also argues that he was not given adequate information in support of Detective Nickles's claim that he recognized the tape of the appellant because of his prior

14

acquaintanceship with him from the neighborhood. Both in his appellate brief and at the suppression hearing, the appellant relies on the single case of Williams v. State, 364 Md. 160, 771 A.2d 1082 (2001).

That opinion, however, is not remotely apposite. In Williams, it was inaccurately represented in pre-trial discovery that a surveilling officer "could not specifically identify the defendant[.]" 364 Md. at 164. Notwithstanding that misrepresentation, "at trial the officer positively identified the defendant." Id. By failing to reveal that an actual identification had been made, the State violated the discovery rule. The difference in Williams was a flat-out binary difference between identification and non-identification.

> The pre-trial assertion that Trooper Williams could not state, beyond a reasonable doubt, that the man he saw was Williams, and the in-trial positive identification are not mere variations of degree, but rather are contradictory.

364 Md. at 175 (emphasis supplied).

In this case, there is no such difference. There has never been any doubt that it was Detective Nickles who identified the person on the Red Fish security tape as the appellant. The appellant, however, would read Williams to hold that when an individual makes a confirmatory identification based on a prior acquaintanceship in the neighborhood, the State is required to detail by chapter and verse all of the incidents that go into the history of that prior neighborhood relationship. Williams does not remotely deal with such a situation. The clash there was between identification and non-identification. The appellant cites no case that does, and we know of none.

15

In the case of a prior relationship, moreover, the appellant would be as fully knowledgeable about the details of the acquaintanceship as would be Detective Nickles. The appellant never asked for a continuance so that he could investigate the relationship further. In examining the detective at the suppression hearing and at the trial, the appellant never probed the details of the prior relationship. He was obviously not surprised and his defense was not in any way compromised. At the conclusion of the suppression hearing, Judge Handy ruled:

> THE COURT: <u>Your motion is denied.</u> You've given sufficient information if you wanted to do any kind of, which <u>you haven't proffered, what kind of investigation you would do if you had additional information. You were told the neighborhood in which the Detective knew your client from.</u> You had all the information, and <u>you haven't provided me with any way that you've been prejudiced.</u> I don't, so <u>basically you're saying because of this discovery violation,</u> as you put it, <u>the identification should be excluded, that request is denied.</u>

(Emphasis supplied). We see no error in that ruling. <u>See Cole v. State</u>, 378 Md. 42, 56, 835 A.2d 600 (2003) ("'. . . . Generally, unless we find that the lower court abused its discretion, we will not reverse.'").

**Sanctions And Windfalls**

Even if, purely <u>arguendo</u>, Judge Handy had ruled that there had been a discovery violation, that would by no means have ended the matter. There would still be an open question as to the appropriate sanction for a discovery violation. All too frequently, the party who has suffered a discovery violation looks not for an appropriate sanction but for a windfall, as does the appellant here. In <u>Ross v. State</u>, 78 Md. App. 275, 286, 552 A.2d

16

1345, <u>cert. denied</u>, 316 Md. 365, 558 A.2d 1207 (1989), we sought to cool any such unrealistic expectations.

> The appellant's final contention is that Ms. Jones's telephone log and the equipment request and log sheet from the telephone company should have been suppressed because they were not discovered to the appellant pretrial. <u>Assuming that they should have been discovered pretrial, the appellant yearns for a sanction which is excessive. The discovery law is not an obstacle course that will yield a defendant the windfall of exclusion every time the State fails to negotiate one of the hurdles</u>. Its salutary purpose is to prevent a defendant from being surprised. Its intention is to give a defendant the necessary time to prepare a full and adequate defense.

(Emphasis supplied).

In <u>Thomas v. State</u>, 397 Md. 557, 570, 919 A.2d 49 (2007), Judge Raker for the Court of Appeals thoroughly surveyed the menu of sanctions available for violations of the discovery rule.

> "If at any time during the proceedings the court finds that a party has failed to comply with this Rule or an order issued pursuant to this Rule, <u>the court may order that party to permit the discovery of the matters not previously disclosed, strike the testimony to which the undisclosed matter relates, grant a reasonable continuance, prohibit the party from introducing in evidence the matter not disclosed, grant a mistrial</u>, or <u>enter any other order</u> appropriate under the circumstances."

(Emphasis supplied; citation and footnote omitted).

The Court of Appeals very carefully noted, however, that the decision might be not to impose any sanction at all.

> Therefore, <u>the presiding judge</u> has the discretion to select an appropriate sanction, but <u>also has the discretion to decide whether any sanction is at all necessary.</u>

<u>Id</u>. (Emphasis supplied).

17

In Thomas, the Court of Appeals very thoughtfully reviewed the broad issue of appropriate sanctions for discovery rule violations. Citing wide support from federal caselaw and from ABA Standards, the Court observed:

> The most accepted view of discovery sanctions is that in fashioning a sanction, <u>the court should impose the least severe sanction that is consistent with the purpose of the discovery rules.</u>

397 Md. at 571 (emphasis supplied; citations omitted).

Because the broad purpose of discovery is to protect the defense from being sandbagged, the most appropriate sanction is frequently a simple continuance.

> Where remedial measures are warranted, <u>a continuance is most often the appropriate remedy.</u>

397 Md. At 573 (emphasis supplied; citations omitted).

At the far end of the sanction spectrum, the exclusion of evidence, such as Detective Nickles's identification of the appellant in this case, is strongly disfavored.

> <u>Exclusion of evidence for a discovery violation is not a favored sanction</u> and is <u>one of the most drastic measures that can be imposed.</u>

397 Md. at 572 (emphasis supplied; citations omitted).

The odds of the appellant's prevailing in his effort to reverse the suppression ruling in this case were extremely long. The odds of reversing the convictions were even longer.

### A Procedural Caveat

This suppression hearing contention is a graphic illustration of why we criticize the appellant's argument for its failure to turn square corners. We think we have correctly identified the appellant's suppression hearing contention as one urging that Detective Nickles's confirmatory identification of the appellant on the security tape be suppressed as

18

a sanction for the discovery law violation of failing to provide adequate information in support of the detective's basis for being able to recognize the appellant. That is our operating assumption. Judge Handy seemed to have based her ruling on the same perception of the appellant's purpose. It is also conceivable, however, that the appellant is urging the suppression of the identification on the very different ground that the identification was unreliable because the image on the security tape was not clear enough to permit a reliable identification. That would be a scattershot attack, for he does not make it clear whether he is invoking discovery law or identification law as the context for his claim.[1] He flounders about in the minutiae of an unidentified microcosm without making it clear where he is trying to go in macrocosm. He, in effect, leaves it to us to supply his macrocosm. "Here are my facts. Find me a category into which they fit." As he wanders back and forth randomly across categorical boundary lines, we would prefer a bit more parade ground precision in the deployment of defense arguments, rather than being

---

[1] There is the intriguing possibility that the appellant was urging yet a third rationale for suppressing his identification by Detective Nickles—the idea that the police precipitately charged him without having conducted a thorough and adequate investigation of other obvious possibilities. The following immediately preceded the court's order to "discontinue that line of questioning."

> THE COURT: . . . . You can't be taking out pictures of every white male in Hampden and that have a record for burglary and show it to the detective and start questioning about it.

> [DEFENSE COUNSEL]: Your Honor, it goes to the lack of investigation in this case.

(Emphasis supplied).

19

required to referee a doctrinal free-for-all. In making an argument, the appellant must provide the legal context for such an argument.

### The Permissibility Of A Line Of Questioning

In his second contention, the appellant employs some of the same categorical ambiguity. He presents us with incontrovertible facts in microcosm, but he is exasperatingly vague as to where he is trying to go with those facts in macrocosm. From the totality of circumstances, we (or the trial judge in the exercise of her discretion) are left to make an educated guess.

The appellant's second contention is that, in the trial proper, Judge Handy unconstitutionally denied him an opportunity to present his defense to the charges against him when she unduly restricted defense counsel's cross-examination of Detective Nickles with respect to the detective's identification of the appellant as the individual depicted on the security camera tape. The court's ruling did not simply sustain the State's objection to a single question. It directed the defense to discontinue "that line of questioning."

BY [DEFENSE COUNSEL]:

> Q. Detective, you know Nicholas Zissimos?
>
> A. I do.
>
> Q. He's from the Hampden area?
>
> A. I know him.
>
> Q. Been involved in a lot of burglaries and thefts?
>
> [THE STATE]: Objection.
>
> THE COURT: Sustained.

20

[DEFENSE COUNSEL]: May we approach, Your Honor?

THE COURT: Is it the same issue we just discussed?

[DEFENSE COUNSEL]: Yes, Your Honor. I'd like to update some information.

THE COURT: Sustained.

BY [DEFENSE COUNSEL]:

Q. Would it be fair to say that Nicholas Zissimos and Murray Myers --

[THE STATE]: Objection, Your Honor.

THE COURT: Come up. All right, yes, come up.

[THE STATE]: Your Honor, this is the exact same thing. He's just trying to get information about someone else that looks like, is a white male, middle age involved in burglaries, could it be the person. . . . .

THE COURT: All right. You need to discontinue that line of questioning. This gentleman doesn't have anything to do with this case. . . . You can't be taking out pictures of every white male in Hampden and that have a record for burglary and show it to the detective and start questioning about it.

[DEFENSE COUNSEL]: Your Honor, it goes to the lack of investigation in this case. It goes to comparison. We're dealing with images and videos.

THE COURT: You're pulling people out of the air. Do you have anything to base your questions that they did this crime?

[DEFENSE COUNSEL]: If I can ask the questions. The detective just said he's very familiar with Nicholas Zissimos.

THE COURT: You're speculating.

[DEFENSE COUNSEL]: Very familiar.

21

THE COURT: <u>You have no basis for asking the question. The objection is sustained.</u>

[DEFENSE COUNSEL]: His response is "I'm very familiar."

THE COURT: <u>Discontinue that line of questioning.</u>

(Emphasis supplied).

The correctness or incorrectness of that ruling would depend, in major measure, upon the perceived purpose of such a "line of questioning." Should more than one purpose seem plausible, one admissible and the other inadmissible, a discretionary decision would be called for by the trial judge responsible for ruling on admissibility.

When the trial judge has made such a discretionary ruling on the admissibility of a question or of a piece of evidence, it is hornbook law that appellate review is broadly deferential. As the Court of Appeals noted in <u>Sifrit v. State</u>, 383 Md. 116, 128, 857 A.2d 88 (2004):

> It is well established in this State that <u>the admission of evidence is committed to the considerable discretion of the trial court.</u>

(Emphasis supplied; citation omitted). <u>See also Merzbacher v. State</u>, 346 Md. 391, 404, 697 A.2d 432 (1997).

In <u>Fontaine v. State</u>, 134 Md. App. 275, 287–88, 759 A.2d 1136, <u>cert. denied</u>, 362 Md. 188, 763 A.2d 734 (2000), Judge Kenney wrote for this Court:

> It is ordinarily within the sound discretion of the trial court to determine the admissibility of evidence, and, thus, <u>we do not disturb a trial court's evidentiary ruling absent</u> error or <u>a clear abuse of discretion.</u>
>
> . . . .

22

Thus, <u>where a trial court's ruling is reasonable, even if we believe it might have gone the other way, we will not disturb it on appeal.</u>

(Emphasis supplied; citations omitted). <u>See also Peterson v. State</u>, 196 Md. App. 563, 584, 10 A.3d 838 (2010). We also explained in <u>Peterson v. State</u>, 196 Md. App. at 584, that:

> ". . . . There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court.'"

(Citation omitted). <u>See also Metheny v. State</u>, 359 Md. 576, 604, 755 A.2d 1088 (2000); <u>In re Adoption/Guardianship No. 3598</u>, 347 Md. 295, 312, 701 A.2d 110 (1997).

The broad deference extended to such discretionary rulings by the trial judge covers, of course, rulings on the admissibility of questions, on direct and on cross-examination, as well as rulings on the admissibility of physical or documentary evidence. As Judge Karwacki noted for this Court in <u>Brown v. State</u>, 74 Md. App 414, 419, 538 A.2d 317 (1988):

> [T]he Confrontation Clause does not extinguish <u>the wide latitude that a trial judge retains to impose reasonable limits on cross-examination</u> based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.

(Emphasis supplied; citations omitted). <u>See also Delaware v. Van Arsdall</u>, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); <u>Lewis v. State</u>, 71 Md. App. 402, 410, 526 A.2d 66 (1987); <u>Fletcher v. State</u>, 50 Md. App. 349, 356–57, 437 A.2d 901 (1981).

In his appellate brief, the defense argues that the purpose of the line of questioning in issue was simply to challenge the ability of Detective Nickles to have made an accurate confirmatory identification of the appellant as the figure on the security camera tape. The brief asserted:

23

Defense counsel wanted to question Detective Nickles about men (1) with whom he was familiar (2) who lived in the Hampden area and (3) who looked similar to the facial features in the video. This was proper in this case because this was part of the criteria that Detective Nickles used to determine that Mr. Myers was the person pictured in the video. Defense counsel attempted to use this criteria to undermine the credibility of the identification.

(Footnote omitted).

If that were the only viable theory for questioning, the examination should arguably have been allowed. If, on the other hand, the ostensible serving of a legitimate purpose were no more than a device or a subterfuge through which an illegitimate purpose were to be served, that would put the issue in a very different light.

Detective Nickles was never cross-examined with respect to the nature or the extent of his ostensible acquaintanceship with the appellant from the neighborhood. He was never asked how long it had been since he had last seen the appellant and whether there might have been changes in the appearance of the appellant over that lapse of time. Asking the detective to distinguish the person on the tape from pictures used for cross-examination, moreover, would not have required that the pictures, ostensibly resembling the appellant, be of men from Hampden nor that they be of men with criminal records for burglary.

Was a subtle suggestion to be conveyed to the jury, on the other hand, not simply that the detective's identification of the appellant was wrong but that one or more of the Hampden-based burglars in the photographs was actually the culprit in this particular burglary case? All that would be required for that purpose would be a reasonable doubt, and the defense would have accomplished its purpose. That insidious effect of the line of questioning would, of course, be completely illegitimate.

24

In Taneja v. State, 231 Md. App. 1, 149 A.3d 762, cert. denied, 452 Md. 549, 157 A.3d 822 (2016), the appellant was convicted of the first-degree murder of his former wife. Three witnesses called by the defendant and all of whom had some knowledge of the troubled relationship between the defendant and his ex-wife were not permitted to testify. One of the defendant's arguments was that "the witnesses' testimony would have suggested that Singh shot and killed Gabba." 231 Md. App. at 9. This Court explained its reasons for the exclusion of the line of questioning.

> A trial court is given wide latitude in controlling the admissibility of evidence. We review the trial court's decision under an abuse of discretion standard.
>
> . . . .
>
> In accordance with the law on relevancy and admissibility, it follows that a defendant may be excluded from propounding evidence "if it merely cast[s] a bare suspicion upon another or raise[s] a conjectural inference as to the commission of the crime by another."

231 Md. App. at 11–12 (emphasis supplied; citations omitted).

In this case, photographs not simply of men resembling the appellant but of Hampden-based men with convictions for burglary would self-evidently have "cast a bare suspicion upon" them or "raised a conjectural inference as to the commission of the crime" by them. The Taneja opinion went on:

> We are mindful that evidentiary questions are left to the sound discretion of the trial court, and are not to be disturbed—even if we were inclined to rule differently—absent a clear abuse of discretion. In sum, the evidence Taneja sought to introduce through Singh was disconnected and remote. It had no other effect than to raise the barest of suspicion that Singh might have killed Gabba.

231 Md. App. at 18 (emphasis supplied; citations omitted).

25

In Taneja, this Court relied on the Supreme Court's opinion in Holmes v. South

Carolina, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006). The Supreme Court's

opinion, 547 U.S. at 327, quoted with approval from 40 American Jurisprudence 2d

Homicide Sect. 286, at 136–138 (1999):

> "[T]he accused may introduce any legal evidence tending to prove that
> another person may have committed the crime with which the defendant is
> charged . . . . [Such evidence] may be excluded where it does not sufficiently
> connect the other person to the crime, as, for example, where the evidence is
> speculative or remote, or does not tend to prove or disprove a material fact
> in issue at the defendant's trial[.]" Such rules are widely accepted, and neither
> petitioner nor his amici challenge them here.

(Emphasis supplied; footnote omitted).

The Supreme Court, 547 U.S. at 328, also quoted with approval from State v.

Gregory, 198 S.C. 98, 104–05, 16 S.E.2d 532 (1941):

> "'[E]vidence which can have (no) other effect than to cast a bare suspicion
> upon another, or to raise a conjectural inference as to the commission of the
> crime by another, is not admissible . . . . [B]efore such testimony can be
> received, there must be such proof of connection with it, such a train of facts
> or circumstances, as tends clearly to point out such other person as the guilty
> party.'"

(Emphasis supplied).

In this case, there was no remote connection being established (or proffered)

between the men in the photographs and the burglary on trial. In Worthington v. State, 38

Md. App. 487, 381 A.2d 712, cert. denied, 282 Md. 740 (1978), defendant's counsel sought

to cross-examine the victim to introduce evidence of the victim's gambling debts, under

the theory that, because of those debts, the defendant was not the only individual who had

a motive to assault the victim. The Court sustained the State's objection because there was no other evidence submitted by the defense to support such a theory.

If we were to look only at the relatively brief exchange between Judge Handy and counsel when the ruling in issue was made, the purpose of the line of inquiry might arguably have been in doubt. Even in that case, of course, appropriate deference to her discretionary judgment in that regard would suggest affirmance. In this case, however, all doubt or ambiguity was removed the day before. Immediately after the hearing on the suppression motion was concluded on September 18, defense counsel requested a trial postponement. In making that request, the defense made its theory of defense perspicaciously clear.

> Your Honor, defense would request a postponement in this case. <u>I have pictures as well as true test copies of individuals who look like Mr. Myers and have been convicted of burglaries and thefts and even have addresses in the Hampden area.</u> The State, when I talked to them on Friday I believe it was, said that they would object to any of that coming in. It's been previously disclosed, Your Honor. But they're saying that they're going to object to it coming in because this officer was not aware of any of these individuals, any of the information as far as the true test or the mug shots to be able to compare for the identification.
>
> So, Your Honor, <u>we've asked that an investigator be contracted in this case that can go through the file, become familiar with it and then introduce in the defense's case-in-chief facts that the jury is entitled to hear, that there are multiple other individuals fitting the same physical characteristics, age, race, gender, in the Hampden area, with burglaries to be able to let the jury know that there are these other individuals that were not investigated and when you look at the pictures it is very hard to determine who is who because they all look very similar.</u> And when you compare the pictures to the video, you cannot say definitively that it was not one of these other individuals who we have investigated, Your Honor. But the State is objecting to that coming in.

(Emphasis supplied).

27

The inference being advanced by the introduction of photographs of Hampden-based burglars was that one of those other burglars may have been **the** burglar in this case, but with no other connection to the case being shown. Pursuant to <u>Taneja v. State</u>, <u>supra</u>, and <u>Worthington v. State</u>, <u>supra</u>, and pursuant to the Supreme Court's opinion in <u>Holmes v. South Carolina</u>, <u>supra</u>, such questioning is not permitted. Judge Handy astutely appraised the purpose behind the entire line of questioning. Immediately before making her final ruling, she observed:

> THE COURT: All right. You need to discontinue that line of questioning. <u>This gentleman doesn't have anything to do with this case.</u> . . . <u>You can't be taking out pictures of every white male in Hampden and that have a record for burglary and show it to the detective and start questioning about it.</u>
>
> . . . .
>
> <u>You're pulling people out of the air. Do you have anything to base your questions [on] that they did this crime?</u>
>
> . . . .
>
> <u>You have no basis for asking the question.</u> The objection is sustained.
>
> . . . .
>
> Discontinue that line of questioning.

(Emphasis supplied).

In discerning the purpose behind the appellant's entire line of questioning about Hampden-based white men with criminal records for burglary and in ruling that such a line of questioning would not be permitted, Judge Handy did not clearly abuse her discretion.

## A Non-Blockbuster Error In Any Event

In advancing his third contention, the only glitch the appellant has to overcome is his failure to have preserved the contention for appellate review. The appellant now claims that in its closing argument to the jury, the State committed error[2] by making arguments

---

[2] The appellant should note that the State cannot commit error. The State, of course, may be guilty of improper conduct, but that is not "error." As this Court pointed out in DeLuca v. State, 78 Md. App. 395, 397–98, 553 A.2d 730, cert. denied, 316 Md. 549, 560 A.2d 1118 (1989):

> We begin our analysis by restating one of the most fundamental tenets of appellate review: Only a judge can commit error. Lawyers do not commit error. Witnesses do not commit error. Jurors do not commit error. The Fates do not commit error. Only the judge can commit error, either by failing to rule or by ruling erroneously when called upon, by counsel or occasionally by circumstances, to make a ruling.

(Emphasis supplied).

As Judge Powers had earlier carefully and thoughtfully analyzed for this Court in Braun v. Ford Motor Company, 32 Md. App. 545, 548, 363 A.2d 562, cert. denied, 278 Md. 716 (1976):

> We know of no principle or practice under which a judgment of a trial court may be reversed or modified on appeal except for prejudicial error committed by the trial judge. It is a misuse of language to label as error any act or failure to act by a party, an attorney, a witness, a juror, or by anyone else other than the judge. In other words, error in a trial court may be committed only by a judge, and only when he rules, or, in rare instances, fails to rule, on a question raised before him in the course of a trial, or in pre-trial or post-trial proceedings. Appellate courts look only to the rulings made by a trial judge, or to his failure to act when action was required, to find reversible error.

(Emphasis supplied). See also Ball v. State, 57 Md. App. 338, 359, 470 A.2d 361 (1984) ("No matter how reprehensible their conduct, trial attorneys, civil or criminal, for the State or for the defense, cannot, by definition, commit error; their conduct can do no more than serve as the predicate for possible judicial error."), aff'd in part and rev'd in part on other grounds, Wright v. State, 307 Md. 552, 515 A.2d 1157 (1986). This is a part of what we mean in urging appellate advocates to turn square corners.

not supported by the record that tended to vouch for the credibility of Detective Nickles. Properly, of course, the contention should have been not that the State committed error but that the trial judge committed error in not stepping in sua sponte, to preclude or at least to cure any argumentative transgressions on the part of the State.

Of present significance, at no time did the appellant raise any objection to the argument being made by the State. As Martin v. State, 165 Md. App. 189, 195, 885 A.2d 339 (2005), cert. denied, 391 Md. 115, 892 A.2d 478 (2006), points out:

> The failure to object before the trial court generally precludes appellate review, because "[o]rdinarily appellate courts will not address claims of error which have not been raised and decided in the trial court." State v. Hutchinson, 287 Md. 198, 202, 411 A.2d 1035 (1980); see also Md. Rule 8–131(a).

Cognizant of his procedural failing, the appellant asks us to overlook the absence of preservation and to take notice of plain error. In our discretion, we decline to do so.

Nothing more need be said. The adjudicative habit of falling back on plain error requests is becoming so flagrant, however, that some comment seems appropriate. Even if the conduct challenged by the appellant here were, purely arguendo, assumed to be error, that would by no means require that we take notice of it. As this Court pointed out in Morris v. State, 153 Md. App. 480, 507, 837 A.2d 248 (2003), cert. denied, 380 Md. 618, 846 A.2d 402 (2004):

> [A]ppellate invocation of the "plain error doctrine" 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon.

In an effort to capture the magnitude of the plain error that might qualify for judicial notice, the United States Court of Appeals for the First Circuit explained in United States

30

v. Moran, 393 F.3d 1, 13 (1st Cir. 2004), quoting United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987):

> The net result is that plain error review tends to afford relief to appellants only for "blockbuster[ ]" errors.

(Emphasis supplied). That's a word with a lot of impact. See also Martin v. State, 165 Md. App. at 196. Even if the declination of Judge Handy to interfere, sua sponte, in the State's argument to the jury were, arguendo, error, it was not remotely "blockbuster" error.

In our own effort to put into words the magnitude of the plain error that might typically qualify for that rare, rare judicial notice, this Court observed in Garner v. State, 183 Md. App. 122, 152, 960 A.2d 649 (2008), aff'd, 414 Md. 372, 995 A.2d 694 (2010):

> The frequency with which we are called upon to throw the life preserver of plain error to sinking (and eminently sinkable) contentions is almost a litigational scandal. It is as if appellate preservation had become an anachronistic embarrassment. We know, of course, that the possibility of plain error is out there, and on a rare and extraordinary occasion we might even be willing to go there. One must remember, however, that a consideration of plain error is like a trip to Angkor Wat or Easter Island. It is not a casual stroll down the block to the drugstore or the 7–11. The exaggerated cry of alarm in this case evokes no echo of Angkor Wat or Easter Island.

(Emphasis supplied).

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

31